RUBÉN BÁEZ GARCÍA, ETC., demandantes y recurrentes, *v.* COOPER LABORATORIES, INC., ETC., demandos y recurridos.

*Número:* R-85-279      *Resuelto:* 18 de diciembre de 1987

*Enrique Alcaraz Micheli*, de *Ferrer & Alcaraz* y *Luis Roberto Santos*, de *Santos & Báez*, abogados de los recurrentes; *Lydia González* y *Rossell Barrios Amy*, de *McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz Suria*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

En demandas separadas, oportunamente consolidadas por el Tribunal Superior, Sala de Mayagüez, Rubén Báez García y su esposa Joyce Dixon formularon reclamación contra Cooper Vision Pharmaceuticals, Inc. (en adelante

Cooper). Alegaron despido injustificado y discrimen por edad, respectivamente, al amparo de la Ley de Despido Injustificado, Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a *et seq.*), y la Ley Núm. 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. sec. 146 *et seq.*(1) Cooper negó tales alegaciones y adujo que el despido estuvo justificado y que la edad no fue factor determinante. Luego de evaluar la prueba testifical y documental, el tribunal de instancia declaró sin lugar ambas reclamaciones. A solicitud de Báez-Dixon acordamos revisar el reclamo de que el foro primario erró al apreciar la prueba.

## I

La fiel solución del recurso exige una referencia al trasfondo fáctico fundamentado en un análisis cuidadoso y esmerado de la prueba.

El 1ro de julio de 1972, Báez García, de 52 años, fue contratado por Cooper para la posición de Gerente de Personal al ésta iniciar sus operaciones en su planta de San Germán. Ocupó la plaza hasta el 11 de enero de 1978, fecha en que fue nombrado Director de Relaciones con la Comunidad y el Personal. En adición a las funciones que caracterizan el puesto de Gerente de Personal en toda empresa, Báez García tenía a su cargo el área de la cafetería, el programa de deportes y el periódico interno de la compañía.(2)

---

(1) Bajo la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a), se reclamaron $6,500 por el alegado despido, $2,500 de honorarios de abogado, más las costas e interés legal. En la otra reclamación solicitó $250,000 de honorarios, costas e intereses. Pidió, además, su reinstalación en el empleo.

(2) A saber:

"Las funciones y deberes del demandante como Gerente de Personal estaban especificados en la descripción de la plaza y eran los inherentes a un puesto de esa categoría. Básicamente comprendían el reclutamiento de personal, establecer, aplicar y administrar la política y programa de salarios y beneficios, las relaciones con los empleados, establecer e interpretar la política de la demandada

Las evaluaciones de sus superiores desde 1973 a 1978 fueron positivas: *"Very Good"* en 1973 y *"Good"* en los próximos años. Sin embargo, *en todas ellas* se sugiere que reciba adiestramiento en áreas como liderato, gerencia, reclutamiento, técnicas de entrevista y consejería. No obstante, estas recomendaciones no fueron obstáculo para que se le concedieran aumentos de sueldo en cada uno de esos años.

Desde sus inicios en Cooper hasta 1978, Báez García conocía de las deficiencias que existían en ciertas áreas que eran de la competencia exclusiva de su puesto. Sin embargo, no se veía un esfuerzo de su parte para mejorarlas. Al decir del tribunal sentenciador, "durante largo tiempo muchas de las comunicaciones escritas que se le enviaban al demandante de la corporación matriz se quedaban sin contestar. En ocasiones le enviaban memorandos internos como seguimiento a un mismo asunto. Por esta razón, de las oficinas de la corporación matriz tenían que insistir con él una y otra vez que se corrigieran los errores y se solucionaran los problemas".

Esta situación continuó irremediablemente igual, con el agravante de que a medida que la planta de San Germán se desarrollaba, las funciones de la Oficina de Personal se tornaban más complejas y la incompetencia de Báez García, mayormente en el área técnica, se hacía patente. Evidentemente no podía desempeñar de forma satisfactoria y con la excelencia deseada todos los deberes como gerente.

Ello motivó que en enero de 1978 —como parte de una reorganización administrativa— fuera relevado de sus funciones como Gerente de Personal y ubicado en la posición de

---

en materia de personal, mantener récords completos, mantener la moral de los empleados, cuidar por la salud y seguridad de los empleados, administrar las reglas de seguridad, la cafetería de los empleados, publicar el periódico interno de la empresa (Capilo), organizar el programa deportivo, atender las quejas de los empleados y, además, desarrollar y mantener las relaciones con la comunidad." Anejo E, pág. 15.

Director de Relaciones con los Empleados y la Comunidad. Marshall Bautz, Gerente General de la planta, estimó que la personalidad de Báez García —carácter afable y amistoso— se ajustaba más a las funciones de su nuevo cargo. Cabe destacar que, aunque sus deberes y responsabilidades fueron disminuidos considerablemente, en particular la fase técnica, su salario y beneficios marginales permanecieron *iguales*.

A tono con este nuevo diseño administrativo José Llavona fue nombrado Gerente de Personal en febrero. Coetáneo a este nombramiento de Llavona se implantaron otros cambios. Varias de las funciones de la Oficina de Personal fueron transferidas a otros departamentos, su recepcionista pasó a reportarse directamente al Director de Finanzas, se reclutó personal adicional y se asignaron tareas específicas a cada empleado.

Transcurrieron varios meses. La Oficina de Personal estaba reorganizada y funcionaba adecuadamente. En octubre Báez García fue nuevamente designado para ocupar su antigua posición.(3) Otra vez las posiciones de Gerente de Perso-

---

(3) Esta decisión la adoptó el nuevo Gerente General de la planta, James Snyder. No fue del agrado de la Oficina Central de Cooper en New Jersey, según surge de un memorando fechado 10 de noviembre de 1978. En el mismo, Dale Hungerford —de la Oficina Central de Personal— le hizo saber de esta situación a Jack Browning. En lo pertinente, dicho memorando expresa en su idioma original:

.    .    .    .    .    .    .    .

"In my opinion and with which Dr. Bautz agrees, Ruben Baez is a very nice person who is liked by all employees, but his professional skills are weak, especially for an individual who has been in Personnel as long as he has. In addition, he is weak as a manager in that he is not aggressive and does not fight for what he believes is right. For these reasons, Dr. Bautz removed him from the Personnel Manager's job.

.    .    .    .    .    .    .    .

"Thus, when I was informed that Ruben was again responsible for Personnel, I was disappointed because this says to me that P.R. does not want a strong

nal y de Director de Relaciones con los Empleados y la Comunidad quedaron fusionadas. Báez García tuvo una segunda oportunidad de demostrar su capacidad y competencia para ocuparla. La oficina estaba reestructurada y sus responsabilidades reducidas. Aunque había más personal, las funciones técnicas —área de su mayor dificultad— habían sido transferidas a otros departamentos. Lamentablemente no pudo demostrar su habilidad. A partir de su incumbencia, desde octubre de 1978 hasta octubre de 1979, surgieron y se presentaron los mismos problemas que existían antes de la reorganización.

Esta situación llevó a Browning —Jefe del Departamento y Supervisor de Snyder— a intervenir directamente en la evaluación de Báez, correspondiente a marzo de 1979. Su desempeño fue calificado de *"Fair"* y no se le concedió aumento de sueldo. El 15 de octubre del mismo año fue nombrado nuevamente Director de Relaciones con los Empleados y la Comunidad, con el *mismo* salario y beneficios que devengaba hasta el momento. Doce días más tarde, Báez acudió al Departamento del Trabajo y Recursos Humanos y presentó un cargo en el que alegaba discrimen por razón de edad.

Aun cuando sus evaluaciones fueron negativas a partir de febrero de 1980, en marzo recibió un aumento de sueldo.

El pobre desempeño, la falta de motivación y la falta de iniciativa de Báez García ocasionaron —al igual que en 1979— que no se le aumentara el sueldo a tenor con una evaluación de marzo de 1981. Subsiguientemente, de acuerdo con las normas de la empresa, fue evaluado en agosto de 1981. Al no existir modificación alguna en su actitud hacia el

---

knowledgeable Personnel Manager who can contribute, but one who will let all the other managers in the facility do their own thing in the area of personnel.

. . . . . . . .

"For your information, every member of my staff was disappointed when they were informed of the change as the quality of work from the P.R. Personnel Department had improved under Jose's leadership."

trabajo y la empresa, fue despedido y la plaza que ocupaba fue consolidada nuevamente con la de Gerente de Personal.

## II

Ante nos, Báez García señala y discute cuatro errores susceptibles de ser analizados en dos.

Primeramente, cuestiona la apreciación de instancia de que hubo justa causa para su "degradación" y despido. Segundo, alega error perjudicial en la exclusión indebida de cierta evidencia que ofreciera.

El más profundo respeto hacia las disposiciones constitucionales y estatutos que garantizan y protegen los derechos de los trabajadores puertorriqueños,[4] nos impiden refrendar su tesis. La Ley de la Mesada, si bien establece una indemnización para todo empleado contratado sin tiempo determinado, se apuntala en que el despido sea *sin justa causa*. Su Art. 2 contiene guías orientadoras al respecto. Constituye justa causa para el despido:

(a) Que el obrero siga un patrón de conducta impropia o desordenada.

(b) *La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente* o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.

(c) Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.

---

(4) Art. II, Secs. 16, 17 y 18, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982; Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130 de 8 de mayo de 1945 (29 L.P.R.A. sec. 61 *et seq.*); Ley de Salario Mínimo de Puerto Rico, Ley Núm. 96 de 26 de junio de 1956 (29 L.P.R.A. sec. 245 *et seq.*); Ley Núm. 379 de 15 de mayo de 1948 (29 L.P.R.A. sec. 271 *et seq.*), que regula la jornada de trabajo; Ley Núm. 289 de 9 de abril de 1946 (29 L.P.R.A. sec. 295), que establece un día de descanso por cada seis de trabajo.

(d) Cierre total, temporero o parcial de las operaciones del establecimiento.

(e) Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido.

No se considerará despido por justa causa aquel que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. (Énfasis nuestro.) 29 L.P.R.A. sec. 185b.

■ Al enumerar las posibles circunstancias, el legislador concrecionó unas situaciones que sirvieran de norte a los tribunales en los casos en que se invocara esta ley.(5) Aun así, al valorar esa dinámica en una relación típica obrero-patronal, en el Art. 8 determinó imponerle a todo patrono la carga probatoria de justificar en la afirmativa su actuación, exponiendo en la contestación a una querella los hechos que dieron origen al despido. 29 L.P.R.A. sec. 185k.

---

(5) En las *Guías para la Interpretación y Aplicación de la Ley Núm. 80 aprobada el 30 de mayo de 1976*, págs. 28–29, preparadas por el Departamento del Trabajo y Recursos Humanos se señala:

"Esta serie de circunstancias y actos que pueden dar lugar al despido justificado de un trabajador tipifican las circunstancias que a juicio del legislador justifican el despido de un empleado y aunque *no necesariamente agotan las situaciones que pueden constituir justa causa para el despido*, definitivamente delincan el pensamiento y la preocupación del legislador de que la determinación de justa causa no incida, como bajo la Ley Núm. 50, en el arbitrio de los tribunales. La discreción de los administradores de la ley y de los tribunales en la determinación de lo que constituye causa debe necesariamente de partir de la especificación contenida en la ley y la discreción podrá ejercerse solamente en aquellos aspectos relativos a grados o matices, que por la misma naturaleza y limitaciones del proceso legislativo no son susceptibles de ser abarcados exhaustivamente por un estatuto. Muchos de los principios jurisprudenciales sentados bajo la Ley Núm. 50 continuarán vigentes y sirviendo como faros orientadores en la interpretación de la Ley Núm. 80."

En el caso de autos, Cooper cumplió satisfactoriamente con esa exigencia desde el inicio del trámite. Mediante prueba testifical y documental estableció la incompetencia de Báez García para desempeñar cabalmente la plaza de Gerente de Personal. No hay el más mínimo indicio de que actuara festinada o improvisadamente. Cuando las funciones de la plaza se tornaron más complejas, Báez García no pudo controlar la situación. En lugar de prescindir de sus servicios, Cooper le brindó la oportunidad de continuar en la compañía como Director de Relaciones con los Empleados y la Comunidad y, luego de reorganizar la Oficina de Personal, le permitió ocupar nuevamente su antigua posición de Gerente de Personal. Simplemente la idea no funcionó. Su desempeño no fue satisfactorio. Aun así, en octubre de 1979, se le volvió a nombrar al puesto de Director de Relaciones con los Empleados y la Comunidad.

■ No nos convence la tesis de Báez García —como tampoco convenció al tribunal de instancia— de que la empresa estuvo "preparando" el caso para despedirlo. Primeramente, desde el punto de vista de ley, un patrono tiene perfecto derecho a evaluar a su personal según las normas de la empresa. Aquí no se sugiere que las evaluaciones fueran irrazonables. Esa tarea evaluativa es congruente y armonizable con recomendaciones de competencia, mejoramiento y apercibimientos por deficiencias u otras razones. Forman parte del historial individual de cada empleado. Su licitud y utilidad para múltiples fines administrativos son incuestionables.

Segundo, los antecedentes fácticos derrotan tal contención. Desde su primera evaluación en 1973, a Báez García le fueron señaladas deficiencias en el área técnica y gerencial. En autos existen comunicaciones escritas en donde se le llama la atención por sus reiteradas fallas administrativas. Así, el 17 de febrero de 1976 la Sra. Linda Grimes, de la

Oficina Central de Personal, le envió un memorando donde le notificaba la necesidad de que se llenasen correctamente las formas P-11 de personal, y caracterizaba la situación como un área problemática que se le había planteado en varias ocasiones anteriores. Báez García no corrigió la situación. El 31 de agosto del mismo año, Dale Hungerford le escribió otro memorando en el que le requería que la corrijiera.

En mayo de 1979 Koluch le envió un memorando confidencial a Hungerford y señala que Báez García no cumplía con sus funciones de Gerente de Personal. Se informa que no ha seguido la política de la compañía, no ha hecho estudios de los puestos, no conoce la estructura organizacional ni los cambios que habían ocurrido en San Germán, como tampoco había podido lograr que se complementaran correctamente las ya mencionadas formas P-11.

█ En resumen, esta evidencia en unión a otra derrotan la tesis propuesta por Báez García de que la empresa estuvo preparándole un caso en su contra con cuatro o cinco años de anticipación. Todas las circunstancias apuntadas nos mueven a coincidir con el foro de instancia de que su despido no fue caprichoso ni abusivo. En términos jurídicos, el patrono Cooper demostró satisfactoriamente justa causa para el despido, pues fue el resultado de una "transacción lícita y en el curso de los negocios", *Avilés* v. *Corte*, 69 D.P.R. 1 (1948), como consecuencia de la incompetencia en el desempeño de Báez García. *Blanes* v. *Tribunal de Distrito*, 69 D.P.R. 113 (1948). Que prescindiera de sus servicios —después de reinstalarlo al puesto de Gerente de Personal— no altera el dictamen. Cooper ofreció una "cristalina justificación" para despedirlo. *Srio. del Trabajo* v. *I.T.T.*, 108 D.P.R. 536 (1979).[6]

---

[6] Los hechos en *Srio. del Trabajo* v. *I.T.T.*, 108 D.P.R. 536 (1979), son distinguibles al de autos. Allí nos enfrentamos al problema de la primera falta como

## III

En cuanto a su alegación de que hubo discrimen por razón de edad al despedírsele de su empleo, tampoco tiene razón. Esta reclamación, basada en la Ley Núm. 100 de 1959, *supra,* descansa en la presunción de su Art. 3, en el sentido de que "[s]e presumirá que cualquiera de los actos mencionados en las secciones precedentes fueron cometidos en violación de [esta ley] *cuando los mismos hayan sido realizados sin justa causa.* Esta presunción es de carácter controvertible". (Énfasis nuestro.) 29 L.P.R.A. sec. 148.

Adviértase, sin embargo, que la mencionada ley no contiene una definición del significado de *justa causa* para un despido. Por tal razón, en buena hermenéutica, hemos de "recurrir a otras leyes *in pari materia". Beauchamp* v. *Holsum Bakers of P.R.*, 116 D.P.R. 522, 526–527 (1985). Ciertamente, las disposiciones sobre justa causa de la Ley de Despido Injustificado sirven de punto de referencia al interpretar la Ley Núm. 100 de 1959, *supra.* Bajo este prisma, en ausencia de otras circunstancias, nuestra conclusión de que existió justa causa para el despido de Báez García dispone del planteamiento de que la decisión de Cooper estuviera fundamentada en una política discriminatoria por razón de edad.[7]

---

causal de un despido justificado. Aquí las *recurrentes* fallas de Báez García y la actitud hacia sus deberes fueron los factores determinantes del despido.

[7] No tiene el alcance probatorio pretendido, la existencia de un memorando que indica que la filosofía de E.J. Browning es dar oportunidades de empleo *en posiciones de aprendices a jóvenes* brillantes recién graduados de universidad, y que por ello, la Oficina Central de Personal se había comunicado con el Decano de la Facultad de Administración de Empresas de la Universidad de Puerto Rico, Recinto de Mayagüez.

## IV

Réstanos discutir su señalamiento sobre la exclusión de cierta evidencia. A juicio suyo, constituyó error sustancial que amerita revocar la sentencia —*Reglas 5 y 6 de Evidencia*, 32 L.P.R.A. Ap. IV— no haberse admitido un memorando interno que se le envió en noviembre de 1978. Allí se indica —con relación al reclutamiento potencial del reemplazo de J. Lagos— "[e]n general, estamos buscando a una persona joven y dinámica, con experiencia". (Traducción nuestra.) *Exhibit* VI, pág. 123.

Del contenido de esa comunicación Báez García deduce y nos sugiere que era política de la empresa favorecer a los jóvenes en el reclutamiento de su fuerza trabajadora. Sostiene su admisibilidad bajo la Regla 20(D) de Evidencia:

Cualquier evidencia de hábito o de costumbre es admisible para probar conducta en una ocasión específica de conformidad al hábito de costumbre. 32 L.P.R.A. Ap. IV.

No tiene razón.

Para establecer que una persona actuó de conformidad con su hábito o costumbre es menester que se demuestre la existencia de un patrón de conducta reiterado. Por definición, un acto aislado no constituye base suficiente para establecer dicho hábito. Después de todo, "[l]as notas características del hábito son la uniformidad y regularidad". E.L. Chiesa, *Evidencia de carácter y de conducta específica bajo las Reglas de Evidencia de 1979*, 15 Rev. Jur. U.I. 45, 63 (1980). En igual sintonía, véanse: *McCormick, Evidence* Sec. 195 (2da ed. 1972); S. Saltzburg y K. Redden, *Federal Rules of Evidence Manual*, 3ra ed., Charlottesville, Virginia, The Michie Co., 1982; *United States* v. *Angelilli*, 660 F.2d 23 (1981); *Meyer* v. *United States*, 464 F. Supp. 317 (1979); *Reyes* v. *Missouri Pac. R. Co.*, 589 F.2d 791 (1979); *Wilson* v. *Volkswagen of America, Inc.*, 561 F.2d 494 (1977).

Salvo esta comunicación y la referente al reclutamiento de recién graduados en el Colegio de Mayagüez, no se presentó prueba suficiente que nos permita inferir o concluir que Cooper acostumbraba discriminar en el reclutamiento o retención de sus empleados por razón de edad. Nada más hay en los autos para sostener lo contrario. No existe ninguna otra instancia, en los muchos años en que Báez García fue Gerente de Personal —estrechamente relacionado con el reclutamiento de los numerosos empleados de Cooper— en qué afianzar una política discriminatoria por edad. De haber existido, lógicamente por su conocimiento y acceso, la hubiese presentado.

## V

A modo de epílogo, merece unos comentarios el señalamiento de Báez García, de que las Determinaciones de Hecho y de Derecho de la Sentencia del Tribunal Superior son idénticas a las presentadas por Cooper en su proyecto de sentencia. La práctica no es per se censurable. Es instrumento auxiliar para los magistrados del país sobrecargados y agobiados de una carga enorme de causas judiciales. Así lo visualiza el Canon II de Ética Judicial que, en lo pertinente, dispone:

> En el cumplimiento de este deber, el Juez resolverá cada controversia a base de su propia evaluación de la prueba presentada. En cualquier asunto sometido a su consideración, podrá, cuando a su juicio lo requieran los fines de la justicia, solicitar de las partes proyectos de sentencias, resoluciones u órdenes. 4 L.P.R.A. Ap. IV-A, C. II.

Como señalamos en *Román Cruz* v. *Díaz Rifas*, 113 D.P.R. 500, 508 (1982): "la costumbre existente en los tribunales de instancia de solicitar que las partes sometan proyectos de sentencia no es, de por sí, una mala práctica . . .". Lo que resulta altamente impropio es " *firmar a*

*ciegas' dichos proyectos de sentencia".* (Énfasis en el original.) También véase *Malavé* v. *Hosp. de la Concepción*, 100 D.P.R. 55 (1971).

Nuestro análisis a nivel apelativo demuestra que no hay base para concluir que el tribunal de instancia haya eludido su responsabilidad al evaluar la prueba. Su decisión es confirmada.

*Se dictará la correspondiente sentencia.*

El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita.